IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ALIXA RODRIGUEZ,

                    Plaintiff,

          v.

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-2787 (JBS)

**OPINION**

APPEARANCES:

Agnes S. Wladyka, Esq.
AGNES S. WLADYKA, LLC
1122 Route 22 West
Mountainside, NJ 07092
     Attorney for Plaintiff

Andrew Charles Lynch
Social Security Administration
Office of the General Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19101
     Attorney for Defendant Commissioner of Social Security

**SIMANDLE**, District Judge:

## I. INTRODUCTION

     This matter comes before the Court pursuant to 42 U.S.C §
405(g) to review the final decision of the Commissioner of the
Social Security Administration ("SSA") denying Plaintiff Alixa
Rodriguez's ("Plaintiff") application for supplemental security
income under Title XVI of the Social Security Act, 42 U.S.C. §
401 <u>et. seq.</u> Plaintiff, who suffers from degenerative disc

disease, degenerative joint disease, a major depressive disorder, a schizoaffective disorder, and anxiety disorder, was denied benefits for the period beginning June 1, 2009, the date of alleged disability, to October 14, 2014, the date on which the Administrative Law Judge ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ's decision should be reversed and remanded on two grounds. First, Plaintiff contends that the ALJ erred in determining the Plaintiff's Residual Functional Capacity ("RFC"). Second, Plaintiff argues that the ALJ erred in interpreting and applying the vocational expert's ("VE") testimony.

## II. BACKGROUND

### A.    Procedural History

Plaintiff filed an initial application for supplemental social security income on July 20, 2011, alleging disability beginning June 1, 2009 due to herniated discs in the back, osteoporosis of the right hip, depression, and anxiety. (R. at 19, 81.) The SSA denied the claim on November 17, 2011 (R. at 107), and upon reconsideration on December 14, 2012. (R. at 115.) Hearings were held on March 21, 2014 before ALJ Nicholas Cerulli, at which Plaintiff appeared with counsel and testified, and at which a vocational expert also testified. (R. at 19.) On October 14, 2014, the ALJ issued an opinion denying Plaintiff benefits. (R. at 32-33.) The Appeals Council denied Plaintiff's

request for review (R. at 1.), and Plaintiff timely filed the instant action.

**B.    Personal and Medical History**

The following are the facts relevant to the present motion. Plaintiff was 55 years old as of the date of the ALJ decision. (R. at 31). Plaintiff completed a high school education in Puerto Rico. (R. at 49.) She has no past relevant work experience. (R. at 31.)

        1.    <u>Physical Impairments</u>

Plaintiff was regularly seen as a patient of CAMcare Internal Medicine ("CAMcare") and treated by its doctors and staff. Plaintiff had a history of hyperlipidemia and was seeing a dietician and walking one-and-a-half hours weekly. (R. at 487.) In November 2009, Deborah Horowitz, a resident nurse, and nurse practitioner, treated Plaintiff for a rash. (R. at 501.) Nurse Horowitz diagnosed Plaintiff with bronchitis, but Plaintiff denied discomfort or shortness of breath and wheezing. (R. at 501-502.) Accordingly, Nurse Horowitz prescribed medication and directed that Plaintiff use a nebulizer every four to six hours, as needed. (R. at 502.) The next year, Plaintiff exhibited shortness of breath, wheezing, cough, fever, abdominal pain, sore throat, and earache. (R. at 449.) Nurse Horowitz again diagnosed Plaintiff with acute bronchitis. (R. at 450.)

On February 26, 2010, Plaintiff returned to see Nurse Horowitz, where a scan revealed osteopenia of the right hip. (R. at 478.) Plaintiff, also reporting congestion, had clear lungs. (R. at 478.) Nurse Horowitz prescribed Actonel and Caltrate for Plaintiff's osteopenia. (R. at 480.)

On April 4, 2010, Plaintiff fell and admitted herself to the Cooper University Hospital emergency room. (R. at 438-439.) Cooper University reported a small contusion and superficial hematoma of left flank and hip. (R. at 438-439.) There was no dislocation or fracture of the left shoulder or elbow, nor were the joints affected. (R. at 438-498.)

Two days later, Plaintiff went to Nurse Horowitz exhibiting shoulder pain and swelling of the left hand. (R. at 473.) Nurse Horowitz's physical examination of Plaintiff revealed a decrease in range of motion of the left shoulder, and small nodules on her lung. (R. at 473.) Plaintiff returned for another office visit with Nurse Horowitz on April 23, 2010 for lightheadedness. (R. at 469.) Following a physical exam, Nurse Horowitz noted that Plaintiff had normal sensation, reflexes, coordination, and muscle strength and tone. (R. 469-471.)

Plaintiff's test results in July 2010 showed liver with diffuse steatosis and elevated FTS. (R. at 461, 463.) Consequently, Plaintiff's doctor ordered a GI consult. (R. at 463.) On December 13, 2010, Plaintiff saw Dr. Joshua DeSipio on

referral for abnormal liver tests and fatty liver. (R. at 413.)
Dr. DeSipio's impression was elevated liver tests, possibly
secondary to nonalcoholic steatohepatitis, which could be
implicated by several medications Plaintiff was taking,
specifically Seroquel. (R. at 413.) Seven days after, Plaintiff
showed normal LFTs, no changes to her liver, and improved
hepatic stenosis. (R. at 417.)

On September 7, 2011, Plaintiff saw her treating internist,
Dr. Jimmie Young, complaining of ongoing joint, left shoulder,
and back pains. (R. at 400.) Plaintiff stated these pains were a
problem since her fall in April 2010. (R. at 400.) Dr. Young
completed a physical exam noting tenderness of the left shoulder
and spine but normal full range of motion in all joints. (R. at
401, 403.) Dr. Young prescribed pain medications for both
Plaintiff's lower back and left shoulder, and recommended she
apply heat and exercise. (R. at 403.) He also ordered an MRI for
the upper extremities and an x-ray for her back. (R. at 404.)

On September 22, 2011, Dr. Young made the following
findings based on Plaintiff's left shoulder MRI: severe
tendinopathy and degeneration, consistent with mild degenerative
joint disease. (R. at 398.) The next day, Plaintiff went to Dr.
Young for a follow up visit at which she was referred to see an
orthopedics doctor and directed to begin physical therapy and
schedule a follow up in three months. (R. at 407.) Comparing the

examination of Plaintiff's shoulder with her previous exam from April, 4, 2010, Dr. Young noted there was some interval widening of the A.C. joint, but no abnormality or significant arthropathy was apparent. (R. at 397.)

On January 12, 2012, Plaintiff returned to CAMcare for a follow-up visit with Dr. Young, still complaining about back and shoulder pain. (R. at 409.) Plaintiff's physical exam showed mild tenderness in the back and shoulder with full range of motion in all joints. (R. at 410.) Plaintiff was discharged with instructions to apply heat and take her pain medications as prescribed (Flexeril1 10mg, Naprosyn 500mg), and advised to exercise. (R. at 411.) She was also directed to make an appointment with an orthopedist and schedule a follow up in three months. (R. at 411.)

An exam of Plaintiff's right hip in November 2012 revealed that her hip joint was preserved and the bones were normally mineralized with most likely vascular calcifications of the right lower pelvis. (R. at 610, 613.)

On March 11, 2013, Plaintiff's lumbar spine MRI was examined, finding that the lumbar vertebral bodies demonstrated satisfactory alignment and were of adequate stature. (R. at 666.) The MRI exhibited minimal annular bulging with mild anterior endplate spur formation and no indication of central or neural canal stenosis of the L2-3 level. (R. at 666.) At the L3-

4 level, there was a small left posterolateral disc protrusion causing mild left lateral recess and stenosis. (R. at 666.) The remaining discs were intact. (R. at 666.)

Plaintiff continued seeing Dr. Young and Nurse Horowitz regularly through at least December of 2013, reporting various levels of pain, and sometimes none. (R. at 615-665.) Plaintiff also exhibited spine and right hip tenderness and chronic low back pain. (R. at 627-631, 637-638.) Dr. Young kept Plaintiff on medications for her pain and regularly recommended that she apply heat and home exercise. (R. at 655-691.) When Plaintiff complained of chest pains and asthma attack, Dr. Young noted there was no true "hx" of asthma, but instead severe congestion with cold or illness. (R. at 620.) Plaintiff showed decreased BS of lungs on left and right. (R. at 622.) Plaintiff's medical records showed no evidence of hepatosplenomegaly. (R. at 401-431, 447-498.)

On June 27, 2013, Plaintiff complained of pain all over her body. (R. at 655.) Dr. Young completed an examination report indicating that Plaintiff was unable to work with a disability for 12 months or more. (R. at 653.) He marked her limitations as standing, walking, climbing, stooping, bending, and lifting. (R. at 653.) Dr. Young did not think Plaintiff was a likely candidate for Social Security Income. (R. at 653.)

2. <u>Mental Impairments</u>

Plaintiff's medical records regarding her depression and anxiety begin on December 4, 2009, from South Jersey Behavioral Health Resources ("SJBH"). (R. at 511.) There, Plaintiff reported having mood swings, insomnia, and depression. (R. at 350.) She stated she was diagnosed with depression following the death of her mother. (R. at 346.) Plaintiff took medications for both anxiety and depression, including Xanax, Vistaril, and Elavil, with no side effects. (R. at 513.) She also reported to have previously seen a physiatrist. (R. at 513.) Plaintiff wanted to get back on medication to feel better. (R. at 351.)

Plaintiff's Mental Status Evaluation indicated that she was cooperative and oriented. (R. at 350.) She experienced decreased appetite and insomnia. (R. at 350.) The evaluation reported Plaintiff felt sad and depressed, with thoughts of suicide and feelings of hopelessness and helplessness. (R. at 350.) She reported auditory hallucinations, obsessions, compulsions, phobias, derealization, and paranoia. (R. at 350.) Plaintiff showed moderately-impaired judgment, but fair insight and alert consciousness. (R. at 351.) Plaintiff's problem areas included mood disorder, anxiety, SI, and homelessness. (R. at 351.) Plaintiff's prognosis was fair and she was recommended for individual psychotherapy, psych evaluation, and medication monitoring. (R. at 351.) Outpatient records from December 2009

through April 2011 provide Plaintiff's diagnoses of major depressive disorder, single episode; major depressive disorder, recurrent, unspecified; and schizoaffective disorder. (R. at 345.)

On December 15, 2009 and January 4, 2010 Plaintiff visited Nurse Horowitz, her primary medical provider at the time, who described Plaintiff's mental condition as alert and cooperative with normal mood, attention span, and concentration. (R. at 492, 487.) Plaintiff's next office visit was on January 15, 2010, at which she complained of anxiety, depression, and mental problems. (R. at 484.) Plaintiff was seeing SJBH for therapy and was trying to see a psychiatrist. (R. at 484.) After a physical exam, Nurse Horowitz recorded Plaintiff's mental condition as depressed and tearful and instructed her to come in for a follow up in one month. (R. at 484.)

On January 20, 2010, Dr. Pedro Garcia conducted a psychiatric evaluation. (R. at 386.) Plaintiff exhibited depressed mood and restricted affect. (R. at 390.) Her insight and judgement were fair and intelligence was within average range. (R. at 390.) Plaintiff's Global Assessment of Functioning ("GAF") score was estimated to be 50. (R. at 390.) Therapy was recommended every two to four weeks. (R. at 390.) SJBH's subsequent Medical Management Progress Notes from February 2010

through December of 2011 show Plaintiff's mental status exam was within normal limits. (R. at 531-556.)

On February 26, 2010, Plaintiff returned to Nurse Horowitz with complaints of depression, but noted the "depression is much better." (R. at 478.) Plaintiff denied anxiety and thoughts of violence and suicide, and Nurse Horowitz observed Plaintiff to be alert and cooperative with normal mood. (R. at 478.) Plaintiff remained on medication for her depression, which had "improved," and was instructed to schedule a follow-up appointment in three months. (R. at 479.) On July 9, 2010, Plaintiff was "alert and cooperative; normal mood and affect; normal attention span and concentration." (R. at 462.)

On December 13, 2010, Dr. Joshua DeSipio treated Plaintiff for abnormal liver tests. (R. at 573.) Plaintiff stated she was "doing well" and Dr. DeSipio reported that she was pleasant, alert, and oriented. (R. at 573.) Records from CAMcare Health four days later indicate Plaintiff was "alert and cooperative; normal mood and affect; normal attention span and concentration." (R. at 285.)

When Plaintiff returned on December 20, 2010, Nurse Horowitz noted Plaintiff was "feeling quite depressed today," is having issues sleeping, and that is had been a "very hard year." (R. at 415.) On September 7, 2011, Dr. Young reported that Plaintiff was anxious and agitated. (R. at 401.)

Between July 2012 and March 2014, SJBH's Medical Progress
Notes show Plaintiff's mental status exams were within normal
limits. (R. at 725-740.)

### 3. Plaintiff's Activities

Plaintiff resides with her friend, Ireland Cintron, in his
home. (R. at 47.) According to Plaintiff, she has trouble going
up and down the stairs in the home, but holds on to the railing.
(R. at 68.) She testified to the ALJ that she cleans the
furniture, cooks her own meals, showers, and dresses herself
while sitting down. (R. at 68-69.) Plaintiff cooks fast meals
because she does not like to wait. (R. at 69.)

Plaintiff watches TV, sits on the porch, and listens to the
radio. (R. at 69). She has difficulty following the television
because she pays more attention to what is on her mind. (R. at
69.) Plaintiff speaks, reads, and understands English. (R. at
49.) She reads books, does puzzles, and sometimes goes shopping.
(R. at 69, 347.)

Plaintiff complains that she has difficulty holding things
with her hands, remembering, concentrating, and paying
attention. (R. at 66-67.) She keeps her pills in a jar and
remembers to take them every night. (R. at 66.) Plaintiff is
able to sleep at night when taking medications, but takes naps
every two to three days for two or three hours. (R. at 68.) She
sometimes experiences panic attacks when in closed spaces or

crowds of people and suffers from anxiety and depression. (R. at 57-59.)

Plaintiff has a driver's license, but testified that she does not drive a car because it hurts her back. (R. at 47.) Instead, Plaintiff takes the bus or has a friend drive her to appointments. (R. at 47.) She testified that she cannot lift more than five pounds or sit for more than twenty-five minutes, but can be on her feet for about forty minutes at a time. (R. at 62.)

According to Plaintiff, she does not bend and has problems reaching with her left arm. (R. at 25-26.) She cannot be on her feet to long, does not have much balance, and experiences pain for about two days at a time, which is affected by the weather. (R. at 53.) Plaintiff's testified that she regularly experiences a horrible stabbing pain. (R. at 54).

Plaintiff testified to being on Welfare and Medicaid. (R. at 49.) Plaintiff has not performed any paid or volunteer work since 2009. (R. at 50.) Prior to that, Plaintiff was employed full-time in a laundry facility for nearly three months. (R. at 50-51.) Plaintiff stated "they fired me because my feet get so swollen that my shoes used to bother me, so I used to bend them in the back." (R. at 50.) Afterwards, Plaintiff worked for J&J staffing. (R. at 51.) There, Plaintiff put tax papers in envelopes with no difficulties after her employer allowed her to

use a chair when needed. (R. at 51.) Plaintiff stopped working

after two days because the work was finished and "[t]hey had

moved somewhere else." (R. at 51).[1]

### 4. State Agency Consultants

On September 19, 2011, a State Agency Consultant reviewed

Plaintiff's medical records, concluding Plaintiff had a mild

restriction of daily living activities, a mild difficulty

maintaining social function, moderate difficulty maintaining

concentration, persistence and pace, and no decompensation. (R.

at 85-87.) The mental residual functional capacity assessment

("MRFC") indicated Plaintiff might have issues with her memory

and dealing with complex instructions, but can understand acute

simple instructions, make work related decisions, interact, and

adapt to change. (R. at 87.) Another State Agency Consultant

reviewed Plaintiff's records on November 17, 2011, and conducted

an MRFC; he determined she was moderately limited in maintaining

concentration, persistence, and pace. (R. at 84.) The second

consultant determined that her evident physical impairments had

---

[1] While the ALJ did not directly address Plaintiff's limited work
history in his decision (R. at 31, 50-52), such treatment is
consistent with the SSA's guidance that a claimant will
generally not be considered to have any relevant work experience
when the claimant possesses "no work experience or worked only
off-and-on or for brief periods of time during the [relevant]
15-year period." See 20 C.F.R. § 416.965.

a minimal impact on work related function and were not severe. (R. at 84.)

On November 2, 2011, Dr. Samuel Wilchfort saw Plaintiff who was complaining of ongoing arthritis in the right hip, low back pain, and left shoulder pain. (R. at 505.) At this point, Dr. Wilchfort noted there had been no surgeries or procedures done for these issues. (R. at 505.) Dr. Wilchfort conducted a consultative physical examination of Plaintiff, reporting normal muscle strength absent knee and ankle jerks bilaterally. (R. at 505.) Other than a minor decreased range in motion of the right shoulder, Plaintiff's upper extremities were normal and range of motion was preserved. (R. at 505-506.) Additionally, Dr. Wilchfort recorded Plaintiff's flexion and gait as normal and noted that Plaintiff was "able to toe walk, heel walk, squat." (R. at 505.) He further reported Plaintiff was able to walk at a reasonable pace and without a hand-held assistive device. (R. at 505.)

The next year, on November 6, 2012, Plaintiff was referred to a consultative mental status examination with Dr. David Bogacki. (R. at 602-603.) There, Plaintiff revealed she became depressed nine years ago when her mother became ill and began treatment for it after her death in 2003. (R. at 602.) She said she had occasional periods of crying and feelings of depression, restlessness, and anxiousness. (R. at 603.) Plaintiff's

medications included Trazodone, Clonazepam, Seroquel, Felxeril, Hydrochlorothiazide, Pristiq, Naproxen, Acetaminophen/tramadol, and Crestor. (R. at 602.) She reported no substance abuse or psychiatric hospitalization. (R. at 602.)

Dr. Bogacki reported that Plaintiff was oriented to time, place, and person and her insight, abstraction, and judgement were intact. (R. at 603.) Plaintiff's exam revealed that she was neatly groomed, sensorium was clear, and her affect was appropriate but limited. (R. at 603.) Plaintiff's cognitive screening reveled that Plaintiff could recall seven digits forward and three in reverse, three out of three objects immediately and two out of three objects after five minutes. (R. at 603.) Plaintiff could spell "world" forward and reverse and Dr. Bogacki estimated that her intellectual function was low average. (R. at 603.) Dr. Bogacki diagnosed Plaintiff with a GAF score of 65 and moderate depressive disorder, and opined the prognosis was fair with treatment. (R. at 603.) Dr. Bogacki noted that Plaintiff "has residual capacity to maintain pace and persistence on tasks, follow simple work-related instructions and relate to the public." (R. at 603.)

On November 15, 2012, Dr. Juan Carols Cornejo completed an orthopedic consultative examination of Plaintiff. (R. at 604.) The examination consisted of a review of history, clinical examination, completion of passive range of motion chart, and x-

rays of the right hip. (R. at 604.) Plaintiff was complaining of chronic back pain, left shoulder pain, and bilateral hip pain with numbness and tingling in her bilateral lower extremities. (R. at 604.) Plaintiff was treated with physical therapy and medication. (R. at 604.)

Dr. Cornejo found that Plaintiff had no swelling, atrophy or effusions and sensations were intact. (R. at 607.) She had decreased range of motion in left shoulder, while right upper and all low extremities had full motion. (R. at 607.) Plaintiff had intact fine and gross manipulation and did not require a hand held assistive device. (R. at 607.) Plaintiff's muscle strength of both upper and lower extremities was a four out of five. (R. at 607.) Additionally, based primarily on Plaintiff's subjective reports, Dr. Cornejo rendered an opinion that Plaintiff would be limited from frequent turning and bending her neck and back, from prolonged walking, standing, and repetitive heavy lifting. (R. at 607.) According to Dr. Cornejo, Plaintiff had full function of her hands and would be able to sit for a reasonable amount of time. (R. at 607.)

### 5. Vocational Expert's Testimony

At Plaintiff's hearing on March 21, 2014, the ALJ examined vocational expert William Slavin. (R. at 71.) The ALJ asked the VE if any unskilled occupations in the national economy existed for a hypothetical individual with the following attributes:

Plaintiff's age and education, who can "communicate in English, who has no past relevant work, and who has the following residual functional capacity: light work; occasional climbing, balancing, stopping, kneeling, crouching, and crawling; frequent reaching in all directions with the non-dominant upper left extremity; frequent handling, fingering, and feeling; avoid concentrated exposure to extreme cold and heat, wetness and humidity, dust, fumes, odors and pulmonary irritants; and hazards such as unprotected heights and machinery;" and someone who could perform "unskilled work involving routine and repetitive tasks with occasional changes in the work setting and occasional interaction with co-workers, supervisors, and members of the public." (R. at 71.) The VE stated that such occupations did exist, including those of assembler, electrical accessories (1,300,000 jobs nationally); an assembler, small products (1,600,000 jobs nationally); and bottling line attendant in the beverage industry (about 700,000 jobs nationally). (R. at 72.) The VE stated his testimony was consistent with the Dictionary of Occupational Titles.[2] (R. at 72.)

---

[2] The Dictionary of Occupational Titles is a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy. Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

Next, the ALJ asked the VE how many breaks employers usually give employees throughout the day. (R. at 72.) The VE responded usually three, including a morning, lunch, and mid-afternoon. (R. at 73.) The ALJ asked the VE to assume if the hypothetical individual were off task more than 10 percent of the day in addition to regular breaks, whether said person could perform the jobs the VE identified. (R. at 73.) The VE said she could not and could not do any work in the national economy. (R. at 73.) The ALJ asked the VE about how many absences per month an employer would tolerate. (R. at 73.) The VE claimed that "unskilled workers are hired for dependability," typically two or more absences will result in the employee being let go. (R. at 73.)

The ALJ posed the hypothetical further, asking the VE to assume if the individual in his first question was also restricted "to lifting and carrying up to five pounds occasionally, sitting for less than six hours during an eight-hour work day, and standing less than two-hours during an eight-hour work day," could she still perform the jobs listed. (R. at 73.) The AE responded in the negative. The ALJ followed up by asking if the individual could perform any work in the national economy and the ALJ stated she could perform part-time sedentary work. (R. at 73.)

Plaintiff's attorney then asked the VE to work with the first hypothetical, assuming these certain changes: the individual was limited to only occasional reaching, with the non-dominant arm, and no lifting of that arm above 90 degrees in any direction. (R. at 74.) He asked if these limitations would affect the jobs the VE identified. (R. at 74.) The VE explained the Dictionary of Occupational Titles only describes reaching as far as frequency, and does not differentiate between dominant and non-dominant hand. (R. at 74.) The VE went on to further explain that with bench assembly workers, they typically reach in front of them, they do not make you do bench assembly work reaching full extension and that reaching is frequent to constant. (R. at 74.) Plaintiff's attorney then asked the VE if it was consistent to say that an individual limited to less than frequent reaching with either of their arms would not be able to perform the jobs the VE identified for the first hypo. (R. at 74-75.) The VE responded that it would not be consistent. (R. at 75.) Next, the attorney added hypothetical restrictions on the individuals standing and walking, limiting it to no more than two hours a day out of the eight. (R. at 75-76.). The VE said this would not alter the jobs he identified, however it would eliminate 60 to 70 percent of the 1,600 light unskilled jobs with the overall hypothetical suggested. (R. at 76-77.)

**C.   ALJ Decision**

In a written decision dated October 14, 2014, the ALJ found that Plaintiff had not been disabled within the meaning of the Social Security Act at any time between the date her application was filed and the date of the ALJ's decision because, consistent with Plaintiff's age, education, work experience, and RFC, she was capable of working as an electrical assembler, small products assembler, or bottle line attendant. (R. at 32.)

At the first stage of the five-step sequential evaluation process, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since July 20, 2011, her date of application. (R. at 21.)

At step two, the ALJ determined that the Plaintiff had the following "severe" impairments: degenerative disc disease, degenerative joint disease, a major depressive disorder, a schizoaffective disorder and an anxiety disorder." (R. at 21.) The ALJ found that Plaintiff's asthma was not severe because plaintiff had "no true history of asthma" and has not had to go to the hospital, emergency room, or treating physician for treatment. (R. at 21.) Plaintiff's hyperlipidemia was not severe because it was treated with medication. (R. at 21.) Additionally, the ALJ determined that Plaintiff's hepatitis was not severe. (R. at 21.) After examination, Plaintiff's "abdomen was soft and non-tender and there was no evidence of

hepatosplenomegaly." (R. at 21.) Although Plaintiff might have had nonalcoholic steatohepatitis due to medications and statin therapy, "her liver function studies improved." (R. at 21.) Further, Plaintiff's obesity is not a severe impairment because medical reports "did not include any limitations associated with her weight and no limitations sufficient to preclude work were identified." (R. at 21.)

Notwithstanding Plaintiff's severe physical and mental impairments, at step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal "the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. at 26.) Regarding Plaintiff's physical impairments, the ALJ determined they did not meet Listing 1.02 or 1.04. (R. at 26.) Additionally, Plaintiff's mental impairments did not meet the criteria of 12.04 or 12.06. (R. at 26.) Specifically, the ALJ determined Plaintiff had "mild restriction" in activities of daily living, "moderate difficulties" in social functioning, and "moderate difficulties" with concentration, persistence or pace. (R. at 27.)

Between step three and step four, the ALJ determined that Plaintiff possessed the RFC to perform "light work," except:

> occasional climbing, balancing, stopping, kneeling, crouching, and crawling; frequent reaching in all directions with the non-dominant upper left extremity; frequent handling, fingering, and feeling; avoid concentrated exposure to extreme cold and heat, wetness

and humidity, dust, fumes, odors and pulmonary
irritants; and hazards such as unprotected heights and
machinery; and she is limited to unskilled work
involving routine and repetitive tasks with occasional
changes in work setting; and occasional interaction with
co-workers, supervisors, and the public.

(R. at 28.)

In determining Plaintiff's RFC, the ALJ considered "all
symptoms and the extent to which these symptoms can reasonably
be accepted as consistent with the objective medical evidence."
(R. at 28.) Although the ALJ found that Plaintiff's physical and
mental impairments "could reasonably be expected to cause the
alleged symptoms," he concluded that Plaintiff's statements
"concerning the intensity, persistence and limiting effects of
these symptoms are not entirely credible." (R. at 29.) The ALJ
considered the medical opinions of Plaintiff's treating
physicians and gave "some weight" to State Agency consultant,
Dr. Bogacki, and not greater weight because he did "not quantify
the [Plaintiff's] mental limitations more precisely." (R. at 30,
31.) The ALJ gave little weight to the other consultative and
reviewing State Agency Consultants. (R. at 30.)

The ALJ determined the Plaintiff had no past relevant work.
At the final step, ALJ concluded that there exists, in
significant numbers, jobs in the national economy the Plaintiff
may perform. (R. at 31.) Therefore, the ALJ found Plaintiff was
not disabled. (R. at 32.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); see also Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); see also Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, those findings bind the reviewing court, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

## IV. DISCUSSION

### A.   Legal standard for determination of disability

In order to establish a disability under the Social Security Act, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The promulgated regulations define substantial gainful activity as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

The Social Security Act further establishes that a claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner reviews a claim of disability pursuant to the five-step sequential analysis codified in 20 C.F.R. § 404.1520. The five-step analysis is applied as follows:

At step one, the Commissioner must determine if the claimant currently engages in "substantial gainful activity". 20 C.F.R. § 404.1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckery, 482 U.S. 137, 140 (1987). At step two, the claimant must demonstrate that the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(c). If the claimant's impairment lacks sufficient severity, claimant will be ineligible. Id. At step three, the commissioner is required to compare claimant's severe impairments with the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, presumed to preclude any gainful activity. 20 C.F.R. § 404.1520(d). If claimant does not suffer from a listed impairment or its equivalent, a determination about claimant's residual functional capacity will be made based on all the relevant evidence in the record; the analysis then proceeds to steps four and five. 20 C.F.R. § 404.1520(e). Step four requires a determination of whether the claimant can still perform past relevant work. 20 C.F.R. § 404.1520(f). If the claimant is able to perform past relevant work, the claimant is not disabled, if the claimant is unable to do so or has no past relevant work,

the analysis will proceed to the fifth step. Id. At the fifth
step, the Commissioner will consider the claimant's ability to
perform any other work which exits in the national economy given
the claimants residual functional capacity, age, education, and
past work experience. If s/he is incapable, a finding of
disability will be entered. On the other hand, if the claimant
can perform other work, s/he will be found not to be disabled.
20 C.F.R. § 404.1520(h).

The burden of proof of this analysis resides with claimant
in the first four steps, requiring a claimant to prove each
element by preponderance of the evidence. See Wallace v.
Secretary of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir.
1983). However, the burden shifts to the Commissioner in the
final step. Id. Thus, the Commissioner bears the burden "to
prove that there is some other kind of substantial gainful
employment he is able to perform." Kangas, 823 F.2d at 777; see
also Olsen v. Schweiker, 703 F.2d 751, 753 (3d Cir. 1983).

**B.   Analysis**

Plaintiff challenged the Commissioner's final decision
denying her SSI benefits by claiming that substantial evidence
did not support the decision. Specifically, Plaintiff alleges
that ALJ erred in two particular instances. First, Plaintiff
asserts that the ALJ improperly evaluated the medical evidence
and erred in its RFC determination. (Pl. Br. at 15.) Second,

Plaintiff avers that the ALJ erred in interpreting the VE's responses to the ALJ's hypothetical. (Pl. Br. at 22.)

For the following reasons, this Court finds the ALJ adequately weighed and considered all the medical evidence pertaining to Plaintiff's physical and mental impairments. As such, the Court holds that the ALJ's determination was based on substantial evidence, and will affirm.

### 1. Substantial evidence supports the ALJ's RFC determination

First, Plaintiff argues the ALJ erred in determining her RFC. The plaintiff contends that the ALJ failed to: (1) support Plaintiff's RFC with adequate medical evidence; and (2) give the appropriate credence to the complaints and pain of Plaintiff that was substantiated by medical evidence. (Pl. Br. at 15-16, 19-21.)

"[T]he ALJ — not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361; see also 20 C.F.R §§ 404.1527(e)(1). The ALJ is entitled to weigh all the evidence in making his or her finding. Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011). It is established that "[a]lthough treating and examining physician opinions often deserve more weight . . .'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional

capacity.'" <u>Chandler</u>, 667 F.3d at 361 (quoting <u>Brown</u>, 649 F.3d at 197 n. 2). Where inconsistency in evidence exists, the ALJ retains significant discretion in deciding whom to credit. <u>Plummer</u>, 186 F.3d at 429. However, the ALJ "cannot reject evidence for no reason or for the wrong reason." <u>Id.</u> (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993)); <u>Cotter</u>, 642 F.2d at 704-05.

Plaintiff first argues that the ALJ's RFC determination failed to comply with the appropriate assessment and did not support its RFC determination with medical evidence. (Pl. Br. at 24.) The Court disagrees and finds that the ALJ addressed the relevant medical records pertaining to Plaintiff's physical impairments, including the consideration of CAMcare treatment notes, Dr. Young, Dr. Cornejo, and Dr. Wilchfort. (R. at 23-26, 30.) Additionally, the ALJ discussed in detail the medical findings concerning Plaintiff's back, right hip, and left shoulder limitations, even concluding Plaintiff had degenerative disc disease and degenerative joint disease. (R. at 21, 23-26.)

Accordingly, the ALJ noted Plaintiff's MRIs and physical exam findings from both her treating physician and State agency consultative exams. (R. at 30.) The MRI's of Plaintiff's lumbar spine and left shoulder were discussed, exhibiting in totality, disc protrusion, minimal bulging, severe tendinopathy, mild endplate spur formation, and degenerative changes. (R. at 30.)

Despite these findings, the ALJ supported his determination that Plaintiff could perform light work, observing that treating physician notes showed she had normal posture, gait, reflexes, range of motion, coordination, and muscle strength and tone. (R. at 23, 30.) Plaintiff had mild tenderness, but x-rays of her hip were negative. (R. at 24.) Plaintiff never had any surgeries, reported no hand held assistive device necessary, and could make fists and oppose the fingers in each hand. (R. at 24-25.)

Nonetheless, Plaintiff points specifically to Dr. Cornejo's opinion that Plaintiff "would be limited from frequent turning and bending of her neck and back, from prolonged walking, standing, and from repetitive heavy lifting," to support her argument. (Pl. Br. at 20.) The ALJ properly noted these findings were based on subjective reports, which the ALJ concluded were not credible. (R. at 31.) While Dr. Cornejo found decreased range of motion and muscle strength, he also found that there was no loss of sensation and straight leg raising in the suspine and seated position were negative. (R. at 30.) The ALJ discussed Dr. Cornejo's findings, as stated above, and cited tests that exhibited both positive and negative findings. (R. at 30.) Thus, the ALJ was permitted to give little weight to Dr. Cornejo's opinion that was not supported by objective medical tests. (R. at 31.)

Additionally, Plaintiff argues that Dr. Young confirmed her limitations when he opined that Plaintiff could not work full-time and was limited in standing, walking, climbing, stooping, bending, and lifting. (Pl. Br. at 24.) However, this was based on Dr. Young's disability opinion. (R. at 652-653.) And "a statement by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue;" opinions on disability are reserved to the Commissioner. Adorno v. Shalala, 40 F.3d 43, 47–48 (3d Cir. 1994); see also 20 C.F.R. § 404.1527. Here, the ALJ allotted the opinion little weight for being conclusory with no further explanation and properly noted it was "on an issue reserved to the Commissioner." (R. at 31, 652-653.) Therefore, the ALJ sufficiently addressed medical evidence pertaining to Plaintiff's physical impairments.

Plaintiff's mental impairments were also addressed in the ALJ's determination. Plaintiff relies on additional medical findings from SJBH, outside the portion of its records that the ALJ relied on, and argues that the ALJ minimized her mental impairments. (Pl. Br. at 16.) The Court again disagrees and finds that the ALJ adequately addressed Plaintiff's mental impairments.

Specifically, the ALJ found that Plaintiff's "mental status examinations were essentially normal." (R. at 30.) The ALJ's

determination is amply supported by SJBH's medical records over the years. (R. at 531-556, 724-720.) Plaintiff also claims that the ALJ discounted SJBH records indicating she was diagnosed with Major Depressive Disorder, Schizoaffective disorder, and reported mood swings, insomnia, suicidal ideations, and feelings of hopelessness and helplessness. (Pl. Br. at 17.) However, the ALJ expressly recognized that Plaintiff presents the abovementioned impairments, stating "claimant has the following severe impairments[:] . . . major depressive disorder, a schizoaffective disorder, and an anxiety disorder." (R. at 21.)

In fact, the ALJ addressed the medical evidence from SJBH records and described, in detail, Plaintiff's diagnosis of Major Depressive Disorder. (R. at 22.) The ALJ specified that records showed Plaintiff felt depressed and sad, had mood swings, insomnia, and suicidal ideation. (R. at 22.) In these same records, Plaintiff was also oriented to time, place, and person. She was cooperative with normal thought processes, memory skills and being treated with medication. (R. at 22.) Moreover, the ALJ appropriately discounted certain medical records, such as Plaintiff's GAF score of 50, which "represents a snap shot of [Plaintiff's] functioning at that time and is inconsistent with the overall medical evidence." (R. at 30.) Thus, the ALJ's reliance on SJBH medical records reporting Plaintiff's mental status as normal, is supported by substantial evidence.

Next, Plaintiff argues that the ALJ improperly assessed her pain, using Plaintiff's ability to do certain daily activities to minimize her symptoms. (Pl. Br. at 15, 19.) Plaintiff correctly asserts that the ALJ may not make speculative inferences from medical reports or substitute his own lay opinion in concluding Plaintiff's statements of "the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (Pl. Br. at 18); see also Plummer, 186 F.3d at 429; Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981). In determining Plaintiff's RFC, however, "the ALJ must consider all evidence of record, including the claimant's subjective complaints and evidence of activity level." Schuster v. Astrue, 879 F. Supp. 2d 461, 469 (E.D. Pa. 2012) (emphasis added). Accordingly, SSR 96-7p requires the adjudicator "to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects," in order to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." The assessment of Plaintiff's pain includes a careful consideration of Plaintiff's statements, and inconsistencies in a plaintiff's testimony or daily activities permits an ALJ to conclude that some or all of plaintiff's

testimony is less than fully credible. SSR 96-7p; see also Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002).

Here, the ALJ discussed all the relevant subjective complaints the Plaintiff made concerning both her mental and physical impairments. (R. at 29.) Subsequently, the ALJ addressed the medical evidence in the record and determined that Plaintiff was not entirely credible, as her testimony directly contradicted certain medical evidence. (R. at 30.) Indeed, the ALJ specifically found that "other medical and non-medical evidence" outweighed Plaintiff's allegations. (R. at 30.) For example, Plaintiff possessed the ability to cook, clean, do household chores, do laundry, shop, and take public transportation, all of which were relevant to the ALJ's evaluation. (R. at 29.) She was also able to read and complete puzzles. (R. at 27.) As noted, Plaintiff attested to all of this information. (R at 27, 30, 47, 68-69.). The ALJ also noted that Plaintiff testified inconsistently about taking public transportation. (R. at 30.)

Furthermore, the ALJ gave significant weight to probative medical records that contradicted Plaintiff's subjective complaints. (R. at 30.) These findings showed she was able to "squat, walk on her heels, and walk on her toes." (R. at 30.) Plaintiff was "alert and cooperative, had normal mood and affect, and normal attention span and concentration," and

additional medical reports stated Plaintiff's depression improved. (R. at 30.) Plaintiff had intact fine and gross manipulation. (R. at 30.)

The ALJ also considered Dr. Bogacki's consultative exam findings about her ability to do serial 3's, serial 7's with some error, and that she could spell "world" forward and backwards. (R. at 31.) Some weight was given to Dr. Bogacki's determination that Plaintiff "retains the mental ability to maintain pace and persistence on tasks, follow simple instructions, and relate to the public." (R. at 31.) Therefore, the ALJ's determination of Plaintiff's credibility is supported by substantial evidence.

Moreover, the ALJ gave proper credence to Plaintiff's complaints of obesity and asthma. Plaintiff only testified as to the fact that her weight fluctuates and how much she weighed at that time, but the ALJ appropriately explained that no sufficient limitations associated with her weight were identified in the medical reports.[3] As for Plaintiff's asthma, she never had to go to the hospital for treatment and Plaintiff's treating internist noted no true history of asthma. (R. at 21.) Because Plaintiff has severe congestion at times, the ALJ noted the impairment and how colds affect it. (R. at

---

[3] To the contrary, on the date of ALJ hearing, Plaintiff's BMI was under 30. (R. at 21.)

21.) To that end, the ALJ accounted for Plaintiff's congestion Plaintiff's RFC by stating that she should "avoid concentrated exposure to extreme cold and heat, wetness and humidity, dust, fumes, odors and pulmonary irritants." (R. at 28.)

For all these reasons, substantial evidence supports the ALJ's RFC determination that Plaintiff can perform light work except:

> occasional climbing, balancing, stopping, kneeling, crouching, and crawling; frequent reaching in all directions with the non-dominant upper left extremity; frequent handling, fingering, and feeling; avoid concentrated exposure to extreme cold ad heat, wetness and humidity, dust, fumes, odors and pulmonary irritants; and hazards such as unprotected heights and machinery; and she is limited to unskilled work involving routine and repetitive tasks with occasional changes in work setting; and occasional interaction with co-workers, supervisors, and the public.

(R. at 28.)

### 2. Substantial Evidence supports the ALJ's interpretation and reliance on the Vocational Expert's Testimony

Plaintiff next argues that, because the ALJ failed to expressly account for all of Plaintiff's limitations in the RFC,[4] he erred in interpreting and applying the VE's responses to the hypothetical questions that were posed during the hearing.

---

[4] For the reasons discussed *supra*, the Court finds that the RFC was based on substantial evidence. Accordingly, the Court will not address this argument a second time.

In assessing a claimant's application for benefits, the ALJ is required to: (1) ask, on the record, whether a vocational expert's testimony is consistent with the Dictionary Occupational Titles; (2) elicit a reasonable explanation where an inconsistence appears, and (3) explain in its decision how the conflict is resolved. Zirnsak v. Colvin, 777 F.3d 607 (3d Cir. 2014). If there is a conflict, an explanation must be made on the record and the ALJ must explain in his decision how the conflict was resolved. See Burns v. Barnhart, 312 F.3d 113,117 (3d Cir. 2002). The Third Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Zirnsak, 777 F.3d at 617.

At the hearing, the ALJ asked the VE whether any unskilled jobs exist in the national economy for an individual with Plaintiff's age, education, and RFC. (R. at 71). As described supra, the ALJ determined Plaintiff could perform light work except:

> occasional climbing, balancing, stopping, kneeling, crouching, and crawling; frequent reaching in all directions with the non-dominant upper left extremity; frequent handling, fingering, and feeling; avoid concentrated exposure to extreme cold and heat, wetness and humidity, dust, fumes, odors and pulmonary irritants; and hazards such as unprotected heights and machinery; and she is limited to unskilled work involving routine and repetitive tasks with occasional

changes in work setting; and occasional interaction with
co-workers, supervisors, and the public.

(R. at 28.) This is consistent with the relevant

interrogatory the ALJ posed to the VE. (R. at 71.)

In response to the ALJ's interrogatory, the VE listed three

unskilled positions that an individual with Plaintiff's RFC

could perform (assembler, electrical activities; assembler small

products; and bottle line attendant) and the number of jobs that

existed in the national economy for each. (R. at 72.)

Additionally, the VE confirmed that his testimony was consistent

with the information contained in DOT. (R. at 72.) Thus, the

first Zirnsak factor was satisfied.

The ALJ's hypothetical question must include those

impairments supported by the record and thus, convey the

established limitations. See Rutherford, 399 F.3d at 555;

Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The

ALJ complied with this requirement and his findings were

supported by substantial evidence. Therefore, as there are no

apparent inconsistencies or conflicts with the VE's testimony,

substantial evidence supports the ALJ's reliance on the VE's

testimony. Furthermore, substantial evidence supports that the

Plaintiff could perform work existing in the national economy.

## V. CONCLUSION

For all of the forgoing reasons, the Court finds that substantial evidence supports the ALJ's decision to deny Plaintiff Benefits. Therefore, the decision should be affirmed. An accompanying order will be entered.


**February 26, 2018**                          **s/ Jerome B. Simandle**
Date                                           JEROME B. SIMANDLE
                                               U.S. District Judge